## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BRANDON GRIFFIN,

    Plaintiff,

    v.                                                            Civil Action No.:  PWG-19-2681

SGT. EMANUEL OKOME,
SGT. KENNETH TOMBAUGH,
OFFICER GREG STOCKSLAGER,
OFFICER CHOKE SWINGLER,

    Defendants.

## MEMORANDUM OPINION

In answer to the above-entitled civil rights complaint, Defendants Sgt. Emanuel Okome, Sgt. Kenneth Tombaugh, Officer Greg Stockslager, and Officer Choke Swingler, correctional officers at the Baltimore County Detention Center ("BCDC"), filed a Motion for Summary Judgment.  ECF No. 24.  Plaintiff opposes the motion.  ECF No. 26.  No hearing is necessary to determine the matters pending.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons stated below, the Motion for Summary Judgment shall be denied without prejudice.

### Background

### I.        Complaint Allegations[1]

Plaintiff Brandon Griffin was an inmate at BCDC[2] on October 24, 2018, when he claims that Sgt. Okome ordered the tactical team, consisting of Sgt. Tombaugh and Officer Stockslager, to apprehend him "for no reason."  ECF No. 6 at 1.  Once apprehended, Mr. Griffin claims that Sgt. Tombaugh sprayed mace into his eyes.  *Id.*  Once maced, Mr. Griffin states that Officers

---

[1]      The cited facts are from the allegations in the complaint, ECF No. 1, as supplemented, ECF No. 6.
[2]      Mr. Griffin is now confined at Maryland Correctional Training Center in Hagerstown, Maryland.

Stockslager and Swingler slammed him to the ground aggressively even though he was offering no resistance. *Id.* The mace partially blinded Mr. Griffin, and he claims the officers began beating him while he was on the ground and they were putting handcuffs on him. *Id.*

After he was restrained with handcuffs, Mr. Griffin states that he told the officers he could not breathe and that he was dying because of the amount of pressure they were putting on him. ECF No. 6 at 1. In response, the officers dragged Mr. Griffin off of the tier and into the Sally Port where they grabbed a handful of his hair and banged his head against the wall twice. *Id.* Mr. Griffin reports that his eye and head began bleeding heavily as a result of the assault and that he was "knocked unconscious" by the impact against the wall. *Id.* He states that because he lost consciousness, he does not remember anything after that "until we got on the elevator" where he woke up in cuffs and the beating continued. *Id.*

Mr. Griffin states that the officers knew that they had "bust my head and eye open" and that he was bleeding so badly that the nurses in the medical unit told Sgt. Tombaugh that Mr. Griffin needed to go to the emergency room. *Id.* at 2. Mr. Griffin was taken to GBMC Hospital because he could not breathe. *Id.* He states he is still suffering from head, neck, and back pain as a result of the assault. *Id.* Mr. Griffin also claims the incident has caused him migraine headaches, insomnia, and was damaging to him mentally. *Id.*

## II.     Defendants' Response

Defendants assert that on October 24, 2018, Inmate Gborplay told Sgt. Okome that he had given commissary products to four other inmates who refused to pay him back and threatened him with assault. ECF No. 24-2 at 2, ¶¶ 7-8 (Affidavit of Okome). Gborplay identified Mr. Griffin as one of the four inmates involved. *Id.* at ¶ 9. Sgt. Okome asked Officer Swingler to assist him with

moving the four identified inmates off of Housing Unit 4B where Gborplay was housed.  *Id*. at ¶ 10.

Officer Swingler[3] called Sgt. Okome and told him that Mr. Griffin was requesting to speak to a sergeant.  ECF No. 24-2 at 2, ¶ 11.  Sgt. Okome responded to the housing unit and advised Mr. Griffin that he was being moved to restrictive housing because he was being issued a disciplinary ticket.  *Id*. at ¶¶ 12-13.  Mr. Griffin refused to go to restrictive housing and became very loud in his protests.  *Id*. at ¶ 14.  Sgt. Okome left Housing Unit 4B, contacted Tactical Officers Tombaugh and Stockslager, and asked them to escort Mr. Griffin to restrictive housing.  *Id*. at 3, ¶ 15.

Officer Stockslager states that he went to the 4B dorm area with Officer Tombaugh for the purpose of escorting Mr. Griffin to restrictive housing.  ECF No. 24-3 at 2, ¶ 6.  Upon approaching Mr. Griffin the officers ordered him to pack up his property for the transfer to restrictive housing. *Id*. at ¶ 8.  Mr. Griffin refused to comply with the order.  ECF No. 24-3 at 2, ¶ 9; ECF No. 24-5 at 2, ¶¶ 8-9.  The order to pack his property up was repeated "several more times" by Officer Tombaugh, but according to Officer Stockslager, the orders were met with "further questioning, unreasonable requests, and procrastination."  ECF No. 24-3 at 2, ¶ 10.  Officer Tombaugh then ordered Mr. Griffin to turn around so he could be handcuffed, but Mr. Griffin "resisted by attempting to turn toward Officer Tombaugh."  ECF No. 24-3 at 2, ¶ 11.

According to Officer Tombaugh, he grabbed Mr. Griffin's left wrist with his right hand and Mr. Griffin attempted to pull away.  ECF No. 24-5 at 2, ¶ 13.  In response, Officer Tombaugh

---

[3]     Officer Swingler escorted another inmate out of the area as Sgt. Okome spoke with Mr. Griffin.  ECF No. 24-4 at 2, ¶ 11.  He responded to the area when he heard a call for assistance, but by the time he reached the area Mr. Griffin and the officers were no longer in the area.  *Id*. at ¶¶ 13-14.  He states that his involvement in the incident did not include any use of force against Mr. Griffin.  *Id*. at ¶¶ 15-16.

pinned Mr. Griffin to the wall and ordered Mr. Griffin to put his hands behind his back. *Id*. at ¶ 14. Mr. Griffin refused and attempted to pull away and Officer Tombaugh sprayed Mr. Griffin in the face with "OC Spray." *Id*. at 3, ¶ 15. Mr. Griffin was then pulled away from the wall and handcuffed. *Id*. at ¶ 16.

Officer Stockslager "secured [Mr.] Griffin's left wrist while Officer Tombaugh secured [Mr.] Griffin's right side." ECF No. 24-3 at 2, ¶ 12. Officer Stockslager applied handcuffs to Mr. Griffin's right and left wrist and the two officers then escorted Mr. Griffin to the "top of the housing unit steps to exit 4B housing." *Id*. at ¶ 13.

As the three men approached the 4B Sally Port, Sgt. Okome entered it and Mr. Griffin "spit a rather large amount of mucus and saliva into the face of Sgt. Okome through the mesh window of the inner Sally Port door." ECF No. 24-3 at 3, ¶¶ 14-15, *see also* ECF No. 24-5 at 3, ¶ 19. In response, the inner Sally Port door was opened, and Mr. Griffin was taken to the floor, chest down. ECF No. 24-3 at 3, ¶ 16. Officer Tombaugh took Mr. Griffin to the floor, but Mr. Griffin continued resisting, ignoring orders to stop. ECF No. 24-5 at 3, ¶ 20; ECF No. 24-3 at 3, ¶¶ 17-18. Officer Stockslager states that "[w]ith my right thumb I applied pressure to the mandibular angle behind Griffin's right ear" and that he "secured inmate Griffins' left wrist and upper arm and applied downward pressure . . . while Officer Tombaugh secured [Mr.] Griffin's right side." ECF No. 24-3 at 3, ¶¶ 19-20. Officers Stockslager and Tombaugh assisted Mr. Griffin to his feet and escorted him to the medical unit, where he was evaluated and treated for OC spray exposure. *Id*. at ¶ 21. Officer Tombaugh recalls that during the escort to the medical unit, Mr. Griffin "continued to spit and resist staff by twisting his body and dropping his weight." ECF No. 24-5 at 3, ¶ 21.

According to Officer Stockslager, when Mr. Griffin was seated in the medical treatment area with Officer Tombaugh on his left side and Officer Stockslager on his right side, Mr. Griffin

"in an act of theater relaxed his seated position and lowered himself out of the chair and onto the floor." ECF No. 24-3 at 4, ¶¶ 22-23. The officers guided Mr. Griffin to the floor and secured him there while the medical evaluation was conducted. *Id.* at ¶ 25. Once cleared, Mr. Griffin was assisted to his feet, and he was escorted out of the examination room. *Id.* at ¶ 26.

Upon reaching the "main area," Mr. Griffin again relaxed his posture and he was "securely guided to the floor." ECF No. 24-3 at 4, ¶ 27. Mr. Griffin was escorted to processing after he was back on his feet, where he was placed in a holding cell and his handcuffs were removed. *Id.* at ¶¶ 28-29. No further incidents occurred. *Id.* at ¶ 30. While none of the affidavits submitted by Defendants indicate that Mr. Griffin was transported to GBMC Hospital, an incident report concerning the events notes that he was transported via ambulance with Officers Strawderman and G. Jones providing security. ECF No. 24-7 at 2 ("Section II – Review by Supervisor").

The hospital records indicate that Mr. Griffin reported losing consciousness with fecal incontinence. ECF No. 24-11 at 1. It was also noted that Mr. Griffin had a "right periorbital laceration" and had a decreased range of motion in his left arm with a "deformity at the wrist." *Id.* The physical exam of Mr. Griffin noted a facial laceration at his right eyebrow. *Id.* All other "systems" were reviewed and were negative for any symptoms. *Id.* at 2. The laceration (3 cm long and 1 mm deep) was closed with three sutures. *Id.* at 4. Mr. Griffin was given a CT scan of his head because of his report of loss of consciousness.[4] *Id.* at 6. The CT scan did not reveal any abnormalities. *Id.* Mr. Griffin was also provided with a CT scan of his chest with negative results. *Id.* at 7-8. X-rays of his left forearm and left shoulder also revealed no internal injury or fracture. *Id.* at 9-11.

---

[4]     The "Clinical History" section of the CT Scan report notes that Mr. Griffin did not lose consciousness, but the referral indicates it was made due to "trauma w/ LOC." ECF No. 24-11 at 6.

A Department of Corrections Report was logged, in which Mr. Griffin was administratively charged with violating two rules in the context of the incident involving Mr. Gborplay: (1) threatening bodily harm to any person; and (2) conspiring to commit any offense. ECF No. 24-6 (Incident Report). Mr. Griffin pleaded guilty to the charges. *Id.* at 2. In the context of the October 25, 2018 incident involving Defendants, Mr. Griffin was administratively charged with violating five rules: (1) interfering with correctional staff; (2) assaulting an employee; (3) fighting or excessive horseplay; (4) failure to obey an order of correctional officers; and (5) conspiring to commit any offense. ECF No. 24-7 at 1 (Incident Report). In the section of the report reserved for the inmate's plea, it is indicated that Mr. Griffin pleaded guilty and that he stated, "I was wrong for getting out of hand with my words[.] I failed to obey the order of a Correctional Ofc." *Id.* at 3.

### III.    Mr. Griffin's Opposition

Mr. Griffin's Opposition Response does not include a declaration or affidavit, nor is his complaint signed under oath. ECF Nos. 1, 6, and 26. Notwithstanding that deficiency, Mr. Griffin asserts in his Opposition Response that he never resisted being restrained, nor did he intend any harm to anyone. ECF No. 26 at 1. He states that when Officer Tombaugh pinned him against the wall, he put his hands up as a sign of surrender, but Officer Tombaugh sprayed him with mace anyway. *Id.*

Mr. Griffin states that he has very bad asthma, and when he was "slammed" on his face with the officers' body weight on his back and neck, he could not breathe. ECF No. 26 at 1. He maintains that when he said he could not breathe, the officers became "more aggressive" and continued to hit and kick him. *Id.* Mr. Griffin states that he was "totally at no point in the incident a threat" and that he "never place[d] a finger on anybody." *Id.* During the incident Mr. Griffin

maintains that he was "blinded by the mace," had difficulty breathing, was choking, and he vomited. *Id*.

Mr. Griffin also requests that this Court order Defendants to turn over surveillance video of this incident as he is certain that "the entire facility is under heavy surveillance." ECF No. 26 at 2. He further claims that the hearing officer who conducted the hearing for his infraction said she "saw the whole incident" and that "she did not see [Mr. Griffin] spit on anyone." *Id*.

### Standard of Review

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322–23. On those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.,* the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.

Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

In this inquiry, a court must view the facts and the reasonable inferences drawn "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252. This Court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citation omitted).

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d 435, 448–49 (4th Cir. 2012). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co*., 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d). Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party,"

such as "complex factual questions about intent and motive." *Harrods*, 302 F.3d at 244 (quoting

10B Wright, Miller & Kane, *Federal Practice & Procedure* § 2741, at 419 (3d ed. 1998)) (internal

quotation marks omitted).

## Discussion

On October 25, 2018, the date of the incident, Mr. Griffin was a pre-trial detainee awaiting

trial on charges of possession of a controlled dangerous substance with intent to distribute.  ECF

No. 24-12 (Md. Jud. Case Search concerning *State v. Griffin*, Crim. Indictment 03-K-18-001499

indicating a conviction date of April 4, 2019).  His claim of excessive use of force is therefore

governed by the Fourteenth Amendment.  To state a claim of excessive force in violation of his

Fourteenth Amendment rights as a pre-trial detainee, Plaintiff must demonstrate that "the use of

force is deliberate—*i.e.*, purposeful or knowing."  *Kingsley v. Hendrickson*, 576 U.S. 389, 396

(2015).  Mr. Griffin's claim need not detail a subjective element of his alleged assailant's state of

mind, "a pretrial detainee must show only that the force purposely or knowingly used against him

was objectively unreasonable."  *Id.* at 396-97, *see also Dilworth v. Adams,* 841 F.3d 246, 255 (4th

Cir. 2016).  Objective reasonableness "turns on the 'facts and circumstances of each particular

case.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The court is obliged to "make

this determination from the perspective of a reasonable officer on the scene, including what the

officer knew at the time, not with 20/20 vision of hindsight."  *Kingsley*, 576 U.S. at 397.

Mr. Griffin does not dispute that he refused orders to move from Housing Unit 4B to

restrictive housing when he was asked to do so initially.  I am mindful that the initial confrontation

occurred in the "dormitory area" of the housing unit where there is a significant danger of other

inmates becoming involved in the encounter with officers.  The use of a chemical agent to gain

Mr. Griffin's compliance with handcuffing was reasonable under the circumstances.

The question remains whether the actual force used included gratuitous kicks and blows from the officers that exceeded the need presented by the particular circumstances.  Mr. Griffin states that there is evidence in the exclusive control of Defendants that would establish that he did not spit at anyone and that he was not resisting the officers' attempts to restrain him while in the Sally Port.  He states that the hearing officer at the disciplinary hearing said she did not observe Mr. Griffin spit on anyone in the surveillance tapes.  While Mr. Griffin's opposition is not verified or under oath, that failure does not foreclose the possibility that summary judgment should be denied in order to allow for discovery essential to opposing such a motion.

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney v. Likin*, 656 F. App'x 632, 638 (4th Cir. July 14, 2016) (per curiam); *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).  Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se."  *Putney*, 656 F. App'x at 638.  Mr. Griffin is entitled to engage in discovery for the purpose of opposing the pending motion pursuant to Fed. R. of Civ. Proc. 56(d).  Because this case will proceed to discovery, I will appoint counsel to represent Mr. Griffin.[5]

### Conclusion

Defendants' Motion to Dismiss or for Summary Judgment, construed as a Motion for Summary Judgment, is denied without prejudice subject to renewal.  Defendants shall file an

---

[5]     Mr. Griffin filed a motion for appointment of counsel on January 8, 2021, ECF No. 28, which is GRANTED.

Answer to Mr. Griffin's Complaint on or before January 29, 2021.  Counsel shall be appointed for

Mr. Griffin, after which a discovery and scheduling order will be issued.

A separate Order follows.


__January 13, 2021__                         _____/S/_____

Date                                           Paul W. Grimm

                                                United States District Judge